FILED
United States Court of Appeals
Tenth Circuit

December 18, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

RONALD D. RUSSO,

      Plaintiff-Appellee/Cross-
Appellant,

v.

      Nos. 07-4090 & 07-4102

BALLARD MEDICAL PRODUCTS,

      Defendant-Appellant/Cross-
Appellee.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 05-CV-59-TC)**

---

Constantine L. Trela, Jr., Sidley Austin LLP, Chicago, IL (Michael B. Apfeld, Godrey & Kahn, S.C., Milwaukee, WI and Marcy G. Glenn, Holland & Hart, LLP, Denver, CO, with him on the briefs), for Defendant-Appellant/Cross-Appellee.

Richard D. Burbidge (Jefferson W. Gross and Robert J. Shelby with him on the briefs) Burbidge Mitchell & Gross, Salt Lake City, UT, for Plaintiff-Appellee/Cross-Appellant.

---

Before **McCONNELL, SEYMOUR,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Medical device inventor Ronald Russo brought this lawsuit against Ballard Medical Products contending that the company misappropriated his trade secret and breached the parties' confidentiality agreement by incorporating certain of his innovations into one of its popular medical devices without his consent. After a seven-day trial, a jury found for Mr. Russo and awarded him $20 million in damages. On appeal, Ballard argues primarily that Mr. Russo's state law claims are preempted by federal patent law. Mr. Russo cross-appeals, submitting that the district court erred in declining to add post-verdict, pre-judgment interest to his award. Finding none of the parties' various arguments for reversal persuasive, we affirm.

I

A

In 1983 Ballard introduced its flagship product, the Trach Care 24 catheter, a closed-suction catheter designed to remove debris from endotracheal ventilator tubes without having to disconnect patients from the ventilators on which they depend for oxygen.[1] Before the Trach Care 24, medical professionals relied on an open-suction process, in which they had to disconnect the patient from the ventilator, insert a catheter into the patient's airway to suction accumulated

---

[1] Given the presence of a jury verdict in Mr. Russo's favor, we review (and here recount) the evidence before us in the light most favorable to him.

mucus, and then remove the catheter before reconnecting the ventilator – a process that not only involved temporarily removing the patient from the ventilator, but also a non-trivial risk of infection from the cleaning process.

Mr. Russo is an independent medical device designer. In 1992, Ballard retained Mr. Russo in a consulting role with the aim of improving various aspects of its Trach Care catheter. After completing this project, Mr. Russo continued working independently on tracheal suction devices, while Ballard also worked on its own to improve its product. In particular, Ballard focused on enhancing the useful life span of its catheter. As its name implies, the Trach Care 24 is approved by the United States Food and Drug Administration ("FDA") for only 24 hours' continuous use. After that period, even Ballard's design is insufficient to prevent bacteria from developing to the point of unduly risking patient infection.

In 1997, after several failed attempts to extend the life span of the Trach Care 24, Ballard again sought Mr. Russo's help. Mr. Russo agreed and, building on his independent work, he devised various improvements to the Trach Care 24, all memorialized in a series of drawings and a prototype. These improvements included a vented "duckbill" valve that isolated the patient-side of the catheter assembly from the catheter cleaning chamber – an innovation that allowed mucus to be more effectively cleaned from the catheter in the cleaning chamber while minimizing back flow to the patient. Mr. Russo's improvements

also included an additional "wiper" seal to wipe the catheter clean, which allowed the tip of the catheter to be withdrawn past the wiper seal into the cleaning chamber, leaving secretions in the cleaning chamber. In combination, Mr. Russo's modifications created a more effective method for cleaning Ballard's catheter, which he expected would improve the device's safety and, consequently, its useful life span.

In early 1998, Mr. Russo agreed to meet with Ballard to discuss his improvements, but conditioned any meeting on the parties executing a confidential disclosure agreement ("CDA"). Ballard assented to this condition, sending Mr. Russo a proposed CDA for his consideration. Mr. Russo signed the document and, in April 1998, the parties met in New York City to discuss Mr. Russo's research. In preparation for the meeting, but after signing the CDA, Mr. Russo forwarded a binder of materials to Ballard disclosing his innovations, and he brought additional drawings and a prototype to the meeting itself. During the course of the conference, Mr. Russo gave the drawings to Ballard engineers, showed them the prototype, explained his various improvements, and answered "a million questions." Aplt. App. at 1211.

Before the meeting concluded, Ballard asked Mr. Russo how much it would cost to license his innovations. Mr. Russo replied with a request for $50,000, plus a 5% annual royalty with a guaranteed annual minimum payment of $50,000,

- 4 -

but the parties concluded the meeting without reaching any agreement on terms. Over the next few months, the parties continued to negotiate, during which time Mr. Russo dropped his request to a 3% annual royalty with a $50,000 guaranteed annual minimum. Eventually, Ballard agreed to a 3% royalty rate, but still would not acquiesce to an annual minimum payment and, in August 1998, negotiations ended without a meeting of the minds.

Shortly after the parties broke off negotiations, Mr. Russo asked Ballard's General Counsel, Paul Hess, to return the confidential materials he had shared with Ballard pursuant to the CDA. Mr. Hess promised that he would secure the return of Mr. Russo's materials, but Mr. Russo received nothing. When Mr. Russo brought this to Mr. Hess's attention and renewed his request in September 1998, Mr. Hess represented that Ballard was unable to locate Mr. Russo's materials.

Unknown to Mr. Russo at the time, Ballard made use of his work to secure two patents and introduce a new product to market. In September 1998, Ballard submitted a patent application embodying the innovations Mr. Russo disclosed at the parties' New York meeting; though that application was denied, the Patent and Trademark Office subsequently issued Ballard two patents based on its 1998 application, patent nos. 6,227,200 (the '200 patent) and 6,543,451 (the '451 patent). Both contained the essential innovations embodied in Mr. Russo's

prototype and drawings. The only difference between Mr. Russo's work and Ballard's patents was the substitution of a flap valve for a duckbill valve – although the patent allowed for either kind of valve to be used. Otherwise, the designs were "exactly the same" as the ones Mr. Russo proposed. *Id*. at 1230-32. Ballard's patents allowed it to introduce a new device, the Trach Care 72, which the company began selling in 2001. As its name suggests, Trach Care 72 is approved by the FDA for 72 hours' continuous use. At the heart of the product are Mr. Russo's designs ensuring a superior cleaning process, delaying the build up of potentially infectious bacteria, and thus allowing Ballard's product to be safely employed for an extended period.

B

Believing that Ballard misappropriated his trade secret and violated the parties' CDA, Mr. Russo filed suit in Rhode Island Superior Court. Ballard removed the action to federal court based on diversity jurisdiction and, pursuant to a forum selection clause in the CDA, the case was transferred to the District of Utah. At the trial that followed, the district court submitted two claims to the jury: (1) misappropriation of Mr. Russo's trade secret, and (2) breach of contract (*viz*., the CDA). Both claims turned on Mr. Russo's allegation that, in derogation of the CDA, Ballard misappropriated his drawings and prototype by using them in its Trach Care 72 product. For his trade secret claim, Mr. Russo sought unjust

enrichment damages, and asserted that those damages were properly measured by the net profit the company expected to secure from its Trach Care 72 product over the life of the '200 and '451 patents. Without his innovations, Mr. Russo claimed, Ballard simply could not have created its new product and would have been forced to continue offering only its 24-hour product. Mr. Russo's expert estimated the present value of Ballard's expected net profits from the Trach Care 72 product over the 17-year life of its patents to be $32.3 million. Mr. Russo also sought compensatory damages for his actual loss under the breach of contract claim. Mr. Russo argued that, but for Ballard's breach, the parties would have agreed on at least a 3% royalty rate and a $50,000 minimum annual payment. Using several "conservative" assumptions, Mr. Russo's expert testified that this would have amounted to royalty payments over the life of Ballard's patents with a net present value of at least $2.751 million.

For its part, Ballard contended that Mr. Russo never, at the New York City meeting or otherwise, disclosed any design containing the innovations found in Ballard's Trach Care 72 product. Instead, Ballard submitted, its engineers independently developed all of the innovations embodied in its product. Additionally, Ballard argued that Mr. Russo's state tort claims were preempted by federal patent law. Ballard further challenged Mr. Russo's damages evidence and presented its own damages expert who opined that, even if Ballard did

misappropriate Mr. Russo's innovations, his losses were much smaller than he claimed.

Ultimately, the jury found in favor of Mr. Russo, awarding him $17 million in unjust enrichment damages for his trade secret misappropriation claim and $3 million in damages for his breach of contract claim. The district court entered judgment for Mr. Russo in the amount of $20 million and denied all of the parties' various post-trial motions. Ballard now appeals, asking us to hold Mr. Russo's suit preempted by federal patent law and, alternatively, seeking to overturn the jury's damage awards on a variety of other grounds. For his part, Mr. Russo cross-appeals the district court's denial of post-verdict, pre-judgment interest.

## II

Before reaching the merits of the parties' appeals, we must pause to address a jurisdictional question. Mr. Russo asserts that our jurisdiction arises under 28 U.S.C. § 1291, and that the district court had jurisdiction over this dispute based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. Ballard concurs in this analysis, but identifies a potential wrinkle. Ballard draws our attention to the fact that the Federal Circuit has exclusive jurisdiction pursuant to 28 U.S.C. § 1295 over appeals from district court judgments predicated on 28 U.S.C. § 1338, a provision that gives the district court original jurisdiction over any "civil action

arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks." *Id.* Ballard assures us that neither of these provisions pertains to this case but nonetheless flags them for our independent consideration because, it says, they would, if applicable, divest us of subject matter jurisdiction over this dispute.

It is our obligation always to be certain of our subject matter jurisdiction. *See, e.g., Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1182 (10th Cir. 2000). In fulfilling our obligation in this case, we are guided by the Supreme Court's instruction that the Federal Circuit's exclusive jurisdiction arises under sections 1295 and 1338 if, but only if, "federal patent law creates the cause of action or . . . the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988). In answering this question, we are told to look only to the face of the plaintiff's complaint, not the manner in which the case was tried: "If on the face of a well-pleaded complaint there are reasons completely unrelated to the provisions and purposes of the patent laws why the plaintiff may or may not be entitled to the relief it seeks, then the claim does not 'arise under' those laws." *Id.* at 810 (internal citation, quotation marks, and brackets omitted). "Thus, a claim supported by alternative theories in the

- 9 -

complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories." *Id.* (internal citations, quotation marks, and brackets omitted). *See also AT&T Co. v. Integrated Network Corp.*, 972 F.2d 1321, 1324 (Fed. Cir. 1992).

Mr. Russo's claims for relief do not meet this restrictive test. Neither of his two state law claims for relief was created by federal patent law. And neither "necessarily depends on resolution of a substantial question of federal patent law." *Christianson*, 486 U.S. at 809. In his trade secret claim, Mr. Russo asserts that he disclosed a trade secret to Ballard, that Ballard misappropriated that secret by using it to develop the Trach Care 72 product without his knowledge or consent, and that Ballard's actions harmed him. Under Utah's trade secret statute, this is all Mr. Russo had to prove to prevail. *See* U.C.A. 1953 § 13-24-1, *et seq.* To be sure, Ballard's patents are mentioned in Mr. Russo's complaint as *evidence* showing how Ballard misappropriated his designs. But the fact that patents may be used as evidence in aid of a trade secret claim is not the same thing as raising a substantial (or really, any) question of federal patent law. *See Uroplasty, Inc. v. Advanced Uroscience, Inc.*, 239 F.3d 1277, 1280 (Fed. Cir. 2001) (trade secret complaint does not implicate exclusive Federal Circuit jurisdiction because, while plaintiff may use defendant's patent to show misappropriation, and the patent thus

"may be evidence in support of [plaintiff's misappropriation] allegations . . . the mere presence of the patent does not create a substantial issue of patent law").

What holds true for Mr. Russo's trade secret claim also holds true for his breach of contract claim. To secure damages for the latter claim, Mr. Russo had to show only that he disclosed materials to Ballard pursuant to the CDA, that Ballard then disclosed those materials to others, that Mr. Russo was harmed by this act and suffered damages, and that this result was reasonably foreseeable to Ballard. Here, again, the fact that Ballard used Mr. Russo's ideas to secure patents is surely relevant evidence suggesting a breach occurred, but it does not implicate any question of federal patent law. *See id.* (discussing breach of contract claim as well as trade secret misappropriation claim); *cf. U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000) (when breach of contract claim requires a showing that defendant *infringed* patents, patent law is a necessary element of the breach of contract claim).

### III

With our jurisdiction confirmed, we turn to the merits of Ballard's appeal. First and primarily, the company asserts that, while the nature of the claims presented in Mr. Russo's complaint did not necessarily implicate patent law (and thus invest the Federal Circuit with exclusive jurisdiction), the case Mr. Russo actually presented at trial was "irreconcilable" with federal patent law and so

preempted by it.  Because Ballard's preemption argument – pressed in a variety of ways before the district court, including by motions for summary judgment, directed verdict, and judgment as a matter of law (or, in the alternative, a new trial) – is a legal argument, we review it *de novo*.[2]  We begin by outlining the principles that control our preemption analysis, and then turn to assess their application in Mr. Russo's case.

A

The Supremacy Clause of the Constitution provides that federal law trumps, or preempts, contrary state laws.  U.S. Const. art. VI, cl. 2.   While a seemingly simple rule, preemption takes a number of guises, known variously as explicit, field, and conflict preemption.  The first two of these species of preemption do not bear on our current problem.  Federal patent law does not explicitly preempt state trade secret laws.  *See* 35 U.S.C. §§ 1-376 (2000).  Neither has Congress evinced an intent to occupy exclusively the entire intellectual property field associated with inventions.  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 478-79 (1974).  Our only concern in this case is thus narrowed to conflict preemption. Conflict preemption arises when state law "stands as an obstacle to the

---

[2]  *See Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008) (summary judgment reviewed *de novo*); *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007) (judgment as matter of law reviewed *de novo*); *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996) (motion for new trial reviewed *de novo* when it turns on a question of law).

accomplishment and execution of the full purposes and objectives of Congress," as expressed in this case in the Patent Act. *Id.* at 479 (citations omitted). When it comes to assessing this question, two particular doctrinal strands bear upon our analysis, one illustrated by *Kewanee Oil*, the other by *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989).

1

In *Kewanee Oil,* the Supreme Court confronted the question whether the Patent Act preempted a claim for violation of Ohio's trade secret law, a law substantively identical for our purposes to the Utah trade secret statute under which Mr. Russo sought relief in this case. At the outset, the Court readily acknowledged that good arguments could be mustered for preempting traditional state trade secret claims.[3] Even so, the Court ultimately took the view that such claims do not fatally conflict with federal patent law. *Kewanee Oil Co.*, 416 U.S. at 484-491; *see also Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262-63 (1979) (same holding with respect to contract claims for breach of a royalty agreement).

---

[3] As have commentators who take issue with *Kewanee Oil's* analysis. *See, e.g.,* Sharon K. Sandeen*, Kewanee Revisisted: Returning to First Principles of Intellectual Property Law to Determine the Issue of Federal Preemption*, 12 Marq. Intell. Prop. L. Rev. 299 (2008) (noting that *Kewanee* did not address the trade secret laws of all states and that there have been significant changes in patent law since 1974).

In reaching its conclusion, the *Kewanee Oil* Court stressed that traditional state trade secret laws and federal patent law usually serve complementary, not conflicting, purposes. Both create incentives to invention, after all, and plainly "[i]n this respect the two systems are not and never would be in conflict." 416 U.S. at 484. Trade secret serves this shared purpose, moreover, in arenas "where patent law does not reach," thus mitigating the potential for conflict between the two systems of law. *Id.* at 485. Trade secret laws operate only to protect those ideas held in secret, while patent law affords the exclusive means of protecting the right to an invention only after it is disclosed to the public. *Id.* Similarly, trade secret law applies to innovations that may not ever be amenable to patent, given patent law's strict requirements of novelty, utility, and non-obviousness. *Id.* The *Kewanee Oil* Court also emphasized the social costs associated with preempting state trade secret laws. Without trade secret protection, the Court observed, the holders of trade secrets would be discouraged from sharing their ideas with potential manufacturers who, in such a regime, could not be bound to pay a license fee or protect any secret. *Id.* at 486. Such a rule of law would serve to encourage the "hoard[ing] rather than [the] disseminat[ion]" of knowledge, requiring trade secret holders to "engage in the time-consuming and economically wasteful enterprise of constructing duplicative manufacturing and marketing mechanisms" to get their ideas to market. *Id.* at 486-87. Such inefficiencies

would deter the development and dissemination of scientific and technological innovations, causing "society, as a whole, [to] suffer," *id*. at 486, a result, the Court emphasized, that "cannot be justified by reference to any policy that the federal patent law seeks to advance," *id*. at 487. Indeed, if anything, such a regime would be inimical to patent law's primary purpose, embodied in our Constitution, of "promot[ing] the Progress of Science and the useful Arts." U.S. Const. Art. I, sec. 8, cl. 8.

At the same time, the *Kewanee Oil* Court was not blind to costs and considerations on the other side of the ledger. Though not all trade secrets are amenable to patent, many are, and the potential for conflict between state and federal law is, for these secrets, at its "peak." *Id*. at 489. Federal law expresses a strong interest in seeing that patentable innovations do not stay bottled up in secret but are instead shared with the public in order to promote social progress. This interest is most obviously embodied in patent law's bargain of providing inventors with many years of monopoly rents in return for the public's opportunity to use and enjoy their ideas. *Id*. But even for this class of trade secrets – those amenable to patent and thus for which there is a strong interest in their public dissemination – the Court ultimately declined to preempt traditional state trade secret laws. It did so reasoning that, even here, trade secret laws pose "no reasonable risk" of deterring inventors with patentable ideas from sharing

- 15 -

their work with the world through the patent process. *Id.* Trade secret laws, after all, provide "far weaker protection" than patent law in critical respects. *Id.* at 489-90. While proof of inventorship under patent law operates "'against the world,' forbidding any use of the invention for whatever purpose for a significant length of time," and affording monopoly rents during that period, trade secret laws do nothing to foreclose others from discovering the trade secret holder's idea (either independently or by means of reverse engineering) and exploiting it for profit publicly. *Id.* at 490. So, "[w]here patent law acts as a barrier, trade secret law functions relatively as a sieve," and a rational inventor would have every reason to choose the barrier over the sieve. *Id.* at 490. Of course, there is the possibility that the occasional "rare inventor" will choose trade secret protection over patent protection, even where a patent is available. *Id.* But this, the Court held, is no cause for (serious) concern. Patent law's objective of encouraging scientific and technological progress is not likely to be significantly impeded because, "[i]f something is to be discovered at all very likely it will be discovered by more than one person." *Id.* As the Court put it, "[i]f Watson and Crick had not discovered the structure of DNA it is likely that Linus Pauling would have made the discovery soon." *Id.* at 490, n.19. So, "[e]ven were an inventor to keep his discovery completely to himself, something that neither the patent nor trade

secret laws forbid, there is a high probability that it will be soon independently developed." *Id.* at 490-91.[4]

Under the arrangement contemplated by the Court in *Kewanee Oil*, then, inventors have a choice. They may keep their ideas secret with the protection of state law but run the risk of potential independent discovery by others. Or they may disclose their ideas and enjoy the ensuing legal monopoly afforded by federal patent law. *See Bonito Boats,* 489 U.S. at 149 ("[I]t is a condition upon the inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy or legal monopoly.") (quoting *Metallizing Eng'g Co. v. Kenyon Bearing & Auto Parts Co.,* 153 F.2d 516, 520 (2d Cir.) (L. Hand, J.), *cert denied*, 328 U.S. 840 (1946)).

2

To say that traditional trade secret claims can peacefully coexist with patent law, however, is not to say that states may freely regulate the dissemination of potentially patentable innovations. Far from it. The Court in *Kewanee Oil* cautioned that, if "a State, through a system of protection, were to cause a substantial risk that holders of patentable inventions would not seek patents, but rather would rely on the state protection, we would be compelled to hold that such

---

[4] *See also id.* at 490 (citing for support Singletons and Multiples in Science (1961), in R. Merton, The Sociology of Science 343 (1973); J. Cole & S. Cole, Social Stratification in Science 12-13, 229-230 (1973); Ogburn & Thomas, Are Inventions Inevitable?, 37 Pol.Sci.Q 83 (1922)).

a system could not constitutionally continue to exist." 416 U.S. at 489. This warning anticipated and was amplified by the Court's holding fifteen years later in *Bonito Boats*.

In *Bonito Boats*, the Court faced a Florida statute that made it "unlawful for any person to use the direct molding process to duplicate for the purpose of sale any manufactured vessel hull or component part of a vessel made by another without the written permission of that other person." 489 U.S. at 144-45. In essence, the Florida law afforded vessel hull designers who had already made their designs publicly known (by manufacturing and selling boats embodying their designs) with protections different from, and more extensive than, federal patent law. Plainly, Florida sought to protect its highly prized boat design industry from what it considered to be undesirable competition.

The Court had no difficulty holding Florida's statute preempted by federal patent law, explaining that states "may not offer patent-like protection[s]" to publicly disclosed ideas because "the ultimate goal of public disclosure and use which is the centerpiece of federal patent policy" is contravened by "[a] state law that substantially interferes with the enjoyment of an unpatented utilitarian or design conception which has been freely disclosed by its author to the public at large." *Id*. at 156-57. Simply put, once an idea is in the public domain, federal patent law controls; states may not further insulate their inventors from (or expose

them to) competition. Still, the Court in *Bonito Boats* took pains to reaffirm *Kewanee Oil*, and underscore the compatibility of its holdings. The Court explained that, so long as "the veil of secrecy" continues to shroud an idea, it remains "private" property amenable to state trade secret laws. *Id*. at 149. Federal law requires only, but significantly, that, once that veil is lifted, an inventor must choose between "the protection of a federal patent or the dedication of his idea to the public at large," by placing it in the public domain. *Id.*

B

With this guidance in hand, we turn to the specifics of Ballard's preemption argument, which itself divides into two parts. First, Ballard submits that the liability case Mr. Russo tried was "irreconcilable with the presumption of inventorship arising from Ballard's patents." Appellant's Br. at 5. Second, even if Mr. Russo's liability case is consistent with federal patent law, Ballard argues that the damages he sought are not. In Ballard's view, the district court intruded on Ballard's patents by instructing the jury to award, or allowing Mr. Russo to seek and obtain, the full value of Ballard's invention *per se*, rather than the value of his misappropriated trade secret. We address each of these preemption claims in turn.

Ballard complains that, at trial, Mr. Russo cast himself as the "true inventor" of the Trach Care 72, and that any question of inventorship must be established under federal patent law standards. In Ballard's words, "Russo's claims depended upon establishing that he, and not [Ballard's engineers], was the true inventor of the subject matter of Ballard's patents." Appellant's Br. at 45. And any such claim, Ballard submits, "is irreconcilable with Ballard's patents." *Id.* at 46.

We do not agree. As was true of his complaint, *see supra* Part II, no question of federal patent law was raised by Mr. Russo's trial. He did not seek to be proclaimed the inventor of Ballard's patents, or seek any of the rights associated with inventorship of a patent (*e.g.*, right to exclude the public from exploiting the ideas embodied in those patents). Instead, like any other plaintiff proceeding under traditional trade secret laws, Mr. Russo simply sought to establish that he had a valid trade secret; that he disclosed his secret to Ballard under terms precluding the company from making use of the secret without his consent; that Ballard violated that trust; and that Ballard's conduct caused him harm. Indeed, the court's instructions to the jury on the elements necessary to find liability tracked precisely the elements of Utah trade secret law, and did not

call upon the jury to decide any question falling within patent's domain. *Compare* Jury Inst. 18 & 20 *with* U.C.A. 1953 § 13-24-1, *et seq.*

Exactly the same can be said of Mr. Russo's CDA claim. At trial, Mr. Russo sought simply to establish, consistent with entirely unremarkable breach of contract jury instructions, that Ballard breached the terms of its written promise to maintain Mr. Russo's confidences. The jury in this case was asked to decide whether Ballard disclosed Mr. Russo's secret, as he alleged, "by some 'improper means'" and in violation of the parties' agreement, or whether the company discovered his idea independently "by fair and honest means," a question *Kewanee Oil* has held may be tried under state law without running afoul of federal patent law. 416 U.S. at 475-76.[5]

To be sure, Mr. Russo pointed at trial, precisely as he did in his complaint, to Ballard's patents as *evidence* of *how* Ballard misappropriated his secret and breached the CDA. But this bare fact does not necessarily mean that his trial raised any question of federal patent law, as we have already noted, *see supra* Part

---

[5] In fact, Mr. Russo testified that he had no ability to manufacture catheters and, precisely because of this fact, wanted to ensure his idea's secrecy until he could secure a licensing agreement with a company that had the necessary manufacturing capacity. This, of course, is exactly one of the purposes trade secret law serves in harmony, not at odds, with federal patent law. *See Kewanee Oil*, 416 U.S. at 493 (patent and trade secret law do not conflict in part because "[t]rade secret law promotes the sharing of knowledge, and the efficient operation of industry; it permits the individual inventor to reap the rewards of his labor by contracting with a company large enough to develop and exploit it"); *see also supra* Part III.A.1.

II, let alone suggest that Mr. Russo sought rights associated with being a patent's inventor. As our sister circuit explained in the face of an identical challenge, "[t]he fact that [the defendant] improperly secured [a] patent and used this patent to obtain incremental profits" can be properly used as evidence to show misappropriation of a trade secret and the extent of the plaintiff's resulting damages without suggesting that "[t]he right involved here . . . is . . . 'patent-like' at all." *Univ. of Colorado Found., Inc. v. American Cyanamid*, 342 F.3d 1298, 1306 (Fed. Cir. 2003). Were the law otherwise, it would be incongruous indeed. Any defendant could (and would have a significant incentive to) insulate itself from a trade secret misappropriation claim simply by patenting the stolen idea. And *Kewanee Oil*'s holding that trade secret and patent law can coexist would be significantly impaired because patent law would preempt many (if not most) trade secret claims.

Ballard's arguments from precedent undermine, rather than bolster, its cause. The company relies heavily on *University of Colorado Foundation Inc. v. American Cyanamid,* 196 F.3d 1366 (Fed. Cir. 1999), in asserting that federal inventorship standards should have been used to determine if Mr. Russo was entitled to his relief. In *American Cyanamid*, two University of Colorado research physicians helped American Cyanamid reformulate a prenatal multivitamin/mineral supplement, sharing a confidential manuscript with the company. Without the doctors' knowledge, however, the company eventually

patented a new formula using their research. The doctors and the university sued alleging, among other things, that the company wrongfully used its confidential materials, failed to list them as inventors on the patent, and failed to disclose the patent application to them. In a holding Ballard highlights, the Federal Circuit held that *some* of the claims implicated the question of inventorship and the right to exclude the public from using their invention and, accordingly, had to be decided under federal, not state, law. *Id.* at 1372.

But this tells only half the story. While *some* of the doctors' claims involved patent law issues that had to be decided under federal law, the Federal Circuit went on to hold that not every claim brought by the doctors did so, explaining that "federal patent law does not preempt . . . state law claims" for unjust enrichment for "wrongful use of the Doctors' research results." *Id.* at 1371-72. Ballard also neglects to mention that, after the case was remanded and eventually returned to it, the Federal Circuit reaffirmed this point, holding that the doctors' unjust enrichment claim was properly adjudicated under state law. As our sister circuit explained, the doctors' unjust enrichment claim "is not 'patent-like' at all, . . . [but springs] from Cyanamid's alleged wrongful use of the Doctors' research results. . . . [T]he Doctors' claim of unjust enrichment is a legal claim to remedy the breach of contract implied in law for disclosure of their confidential manuscript in exchange for a promise not to disseminate the idea without the Doctors' consent." *American Cyanamid*, 342 F.3d at 1306. The line

drawn by the Federal Circuit in *American Cyanamid* is thus the very same line we have drawn here, and the same one drawn by the Supreme Court in *Kewanee Oil* and *Bonito Boats*, between those claims, like Mr. Russo's, that arise from the misappropriation of a trade secret, which generally may be tried under state law, and those that seek to exclude others from employing a publicly disclosed idea, which must be tried under federal patent law.[6]

2

Liability aside, Ballard submits that the district court's jury instructions wrongly authorized the jury to give Mr. Russo the full benefit of its Trach Care 72 product *per se*. As Ballard puts it, "the district court should have limited Russo's recovery to damages appropriate to misappropriation" of a trade

---

[6] Ballard's citation to *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1382 (Fed. Cir. 2005), is no more helpful to its cause. There, the Federal Circuit faced a claim by a Ford Motor Company supplier, Ultra-Precision, that Ford took its idea for decreasing noise and vibration in car air conditioning systems without appropriate compensation. Although Ultra-Precision had not patented the technology used by Ford, "'one of ordinary skill in the art' could readily glean the concept" from two of Ultra-Precision's existing patents. *Id.* at 1380. The Federal Circuit held the claim preempted. In doing so, the court emphasized that Ultra-Precision expressly disclaimed any clam associated with exploitation of a *trade secret* – it "never alleged that it enjoyed a confidential relationship with Ford or that its technical information enjoyed trade secret protection." *Id.* Instead, Ultra-Precision sought damages only for the unauthorized use of its *publicly available* information. *Id.* The court held simply and sensibly that, while state law can surely protect trade secrets, the protection of publicly disclosed ideas is the exclusive domain of federal patent law. *Id.* By its terms, this holding has no application to a traditional trade secret case like the one now before us.

secret, but "[i]nstead, the court allowed the jury to award Russo damages for the value of the invention *per se*." Appellant's Br. at 53. The district court's award, Ballard complains, "represents a value protected exclusively by patent law," *id.*, and, to avoid any interference with patent law, the court should have limited Mr. Russo's damages to the "incremental profits derived from use of [his] idea, rather than total profits from selling [a] product incorporating [that] idea." *Id.* at 54. Alternatively, Ballard submits that, even if the district court correctly instructed the jury that Mr. Russo was entitled only to the incremental value his trade secret added to Ballard's product, Mr. Russo tried his case in a way that allowed him to evade the district court's instructions and recoup the full value of Ballard's patents *per se*. *Id.* at 55. As a matter of fact, Ballard contends, Mr. Russo asked the jury "to award, and [the jury] did award, Russo damages for the value of the invention *per se*." *Id.* at 56.

We do not necessarily disagree with the premise undergirding Ballard's arguments. It may be that a state law claim automatically (or *per se*) guaranteeing a plaintiff the full value of a defendant's patents could interfere with federal patent law. But that simply is not the sort of claim we have before us. In any trade secret or breach of a CDA trial, a properly instructed jury may award the plaintiff only those damages it has suffered, or the amount the defendant has been enriched, by virtue of the defendant's misconduct. By dint of this required causal link between the defendant's misconduct and the plaintiff's recovery, the plaintiff

- 25 -

is precluded from obtaining any earnings the defendant received, or value it derived, from other causal factors, including its own innovative work. Recognizing just these points, the district court in this case never required or permitted Mr. Russo to recover the value of Ballard's product or patents *per se*. Instead, in describing the scope of Mr. Russo's permissible damages in connection with his trade secret claim, the court instructed the jury to award only those damages "caused by [Ballard's] violation [of Utah's trade secret law]. . . . Damages for misappropriation of a trade secret may include the actual loss to Mr. Russo caused by the misappropriation. But damages may also include any unjust enrichment flowing to the party that misappropriated the trade secret. In this context, unjust enrichment is defined as the reasonable value of the benefit that the party who misappropriated the trade secret has gained from disclosing or using the trade secret." Jury Inst. 26. Similarly, the court instructed that damages for breach of the CDA had to be limited to those that Ballard "had reason to foresee, at the time the contract was made, as a probable result of that contract." Jury Inst. 27.

With respect to both claims, then, the district court properly informed the jury that Mr. Russo could recoup only amounts causally attributable to Ballard's misconduct, not to other factors, including Ballard's own hard work. In this way, our case again parallels *American Cyanamid*, where the Federal Circuit held that the plaintiffs could and did, without impinging on federal patent law interests,

recoup the "incremental profits" earned by the defendant company that were "attributable to its misconduct" when it improperly secured a patent using the plaintiffs' confidential manuscript. 342 F.3d at 1311. We concur, and so did the district court, which recognized just these points and correctly instructed the jury to abide them in this case.[7]

To be sure, Mr. Russo suggested that Ballard was able to extend the useful life of its product, and thus offer the Trach Care 72, only because of its exploitation of his trade secret. That is, in Mr. Russo's view, all of Ballard's net profits on its Trach Care 72 were causally attributable to its misappropriation of his ideas rather than any other source. But in pursuing this line of argument, Mr. Russo did not suggest that a trade secret violation automatically and *per se* entitled him to the full value of the patents Ballard later secured. Rather, Mr. Russo argued that, on the facts of this particular case, the evidence showed the *incremental value* his trade secret added to Ballard was to transform the useful life span of its Trach Care product from 24 to 72 hours. Ballard cites no authority

---

[7] While now arguing that the district court failed to link Mr. Russo's damages to Ballard's misconduct, at trial Ballard quite happily argued on the basis of the district court's instructions that Mr. Russo's damages should be minimal because its own innovative hard work was responsible for the bulk of its profits on the Trach Care 72 product. *See* Aplt. App. at 2449 (arguing that Mr. Russo admitted "his alleged trade secret contribution to this product would not have exceeded 20 percent" and what Mr. Russo is "providing is a single trade secret. You cannot trump all that other invented intellectual property for other patents.").

suggesting that this is an impermissible theory under trade secret law, or that it somehow impermissibly trenches on federal patent law, and we are aware of none. *See generally C&F Packing Co., Inc. v. IBP, Inc.*, 224 F.3d 1296, 1304 (Fed. Cir. 2000) (the jury was free to decide whether defendant's misappropriation was responsible for 100% of its profits on a particular product, as plaintiff claimed the evidence suggested, or 30%, as defendant claimed).  Of course, Ballard contests whether sufficient evidence exists in the trial record from which a reasonable jury could find that the incremental value added by Mr. Russo accounts for the full difference between Ballard's Trach Care 24 and 72 products, and we recognize the viability of this argument and take it up in earnest shortly, *see infra* Part IV. But, for our current purposes, the dispositive point is that Ballard has identified no *legal* impediment in patent law to Mr. Russo's right to recover the full incremental value added by his misappropriated trade secret, whatever that may be, and in these circumstances we are unable to reverse the jury's award.[8]

---

[8]  Ballard voices a similar complaint when it contends that the Utah trade secret statute allows a plaintiff to recoup only damages arising from his or her contributions wrongly taken by the defendant, not from the defendant's independent contributions.  Appellant's Br. at 62 (arguing that Mr. Russo failed to apportion damages).  And this is surely a fair view of Utah law.  Utah Code Ann. 1953 § 13-24-4(1) ("Damages can include both the actual loss *caused by* misappropriation and the unjust enrichment *caused by* misappropriation that is not taken into account in computing actual loss.") (emphasis added).  But, again, this legal principle simply was not in dispute at trial.  Indeed, the district court's jury instructions tracked the pertinent statutory language.  At trial, the parties' dispute focused on the simple factual question whether and to what degree the Trach Care
(continued...)

IV

As we have foreshadowed, Ballard's legal arguments bleed into a factual one, with the company next contending that the $20 million in damages the jury awarded exceeded what the record evidence could support. We may, of course, reverse a jury's award for lack of a sufficient evidentiary basis when, but only when, viewing the evidence in the light most favorable to the prevailing party, the amount of damages awarded is "clearly erroneous, or there is no evidence to support it." *Hudson v. Smith,* 618 F.2d 642, 646 (10th Cir. 1980); *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1128 (10th Cir. 2004).

Those circumstances do not pertain here. With respect to the jury's $17 million unjust enrichment award, the parties presented competing evidence about the incremental value added by Mr. Russo's contributions to Ballard's Trach Care 72 product. Mr. Russo took the position and presented evidence suggesting that the only material difference between Ballard's Trach Care 24 and 72 products stemmed from its exploitation of his trade secrets; accordingly, in his view, he was entitled to the present value of Ballard's expected net profits on its Trach Care 72 product, or $32 million. Critically, Ballard does not now contest the admission of Mr. Russo's evidence suggesting that he was solely responsible for

---

[8](...continued)
72 product owed its existence to Mr. Russo's contributions versus Ballard's. And on that question, the jury was free to choose any amount supported by the evidence.

the innovations contained in Ballard's Trach Care 72 product; instead, it points us to, and asks us to credit, its contrary evidence suggesting that Mr. Russo's contributions added nothing, or very little of value, to its independent work. As is often the case, the jury found the truth to lie somewhere in between the extremes suggested by the evidence received at trial, returning an award that represented 53% of the damages Mr. Russo sought. When the damages awarded by the jury fall within the range permitted by the evidence admitted at trial (and whose admission is unchallenged on appeal), we may not second guess the award. *See C&F Packing Co.*, 224 F.3d at 1304 ("In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes."); *Hudson,* 618 F.2d at 646; *Bitler*, 391 F.3d at 1128.

Much the same holds true for Mr. Russo's breach of contract claim. Ballard stresses that Mr. Russo's own expert estimated that the 3% royalty the parties discussed would yield $2.751 million over the life of Ballard's patents, not the $3 million awarded by the jury. But Mr. Russo's expert testified that his $2.751 million estimate was "conservative" because, among other things, it employed a 5% annual sales growth figure when Ballard achieved a 42% growth rate in the period 2001 to 2005 and a 17% growth rate in the period 2004 to 2005. Aplt. App. at 1679. In addition, the expert calculated royalties only through the life of the patent (because after such time, anyone could access the technology),

even though he testified such products often have a "very long life." *Id.* at 1683. Mr. Russo's expert testified that modest changes in any of the assumptions he employed would yield a significantly greater award. Ballard does not contest that the evidence could support changes in the expert's assumptions, or that such changes supported by the evidence could yield damages in excess of $3 million. Accordingly, we again are in no position to say that the jury's award was "clearly erroneous, or [that] there is no evidence to support it." *Hudson,* 618 F.2d at 646.

V

While we have addressed Ballard's central arguments, it presents a flurry of additional, but significantly less developed arguments for overturning the jury's damages award. We address the most colorable of these claims here, but find none persuasive.

First, Ballard asserts that Mr. Russo's unjust enrichment and royalty damages should be limited to, and not extend beyond, the two-year contract period discussed in the CDA. This argument, however, depends on a misconstruction of the CDA and a selective view of the evidence. While the CDA indicated that Ballard's obligations to keep Mr. Russo's secrets only extended for two years, it imposed no limit on the damages Mr. Russo could seek in the event Ballard chose to breach the agreement. To be sure, Ballard argues that it was free to make use of the information disclosed by Mr. Russo after the CDA expired.

But it could do so lawfully only if neither Mr. Russo nor anyone else secured patents covering Mr. Russo's innovations during the CDA's two-year term. Ballard strains to suggest that the evidence at trial, as a matter of law, demonstrates that this surely would have been the case. But a strain it is. Ballard points only to the fact that Mr. Russo had not patented or licensed his ideas to another company by the time of its breach. Meanwhile, competing record evidence shows that Mr. Russo was no stranger to the patent process, having patented other ideas previously, and thus that he was presumably able to patent his latest innovations, too. In fact, Mr. Russo testified that the only reason he had not yet incurred the expense of patenting his catheter improvement ideas was *because of* the parties' confidentiality agreement protecting against Ballard's use of his ideas. Mr. Russo further testified that he was still anticipating that Ballard's demonstrated interest in his ideas would lead it, "sooner or later," to license them before the CDA expired. Aplt. App. at 1228; *see also id.* ("Ballard was the largest manufacturer of closed trach suction systems in the world. . . . I knew what I had. They already offered me a substantial amount of money, and I felt that sooner or later they would come back to me."). Plainly, the jury was free to conclude on the basis of these facts that Mr. Russo had a valid reason for waiting to patent his idea and that, in the event the parties' negotiations did not yield a licensing agreement within two years, he was able and ready to secure

appropriate patents that would have foreclosed Ballard's use of his ideas without his consent.

Second, Ballard argues that its misappropriation of Mr. Russo's trade secrets at most only gave the company a "head start" to a result it would have eventually achieved on its own, and that the district court should have given its proffered jury instruction underscoring this point. Under the so-called "head start" or "lead time" rule, adopted in some jurisdictions, a trade secret defendant's damages may be limited to the time the defendant saved in getting a product to market by virtue of its misappropriation. *See* Uniform Trade Secrets Act §§ 2-3 cmts. Ballard has failed to point us to a single Utah case adopting the head start rule, but even side-stepping this deficiency and assuming Utah embraces the rule, we discern no reversible error in the district court's jury instructions. The jury was instructed that unjust enrichment "is defined as the reasonable value of the benefit that the party who misappropriated the trade secret has gained from disclosing or using the trade secret," and that it "may only award damages for a time period equal to the amount of time (1) you find that Mr. Russo's trade secret would be entitled to protection, plus (2) any additional period, if any, that you find that the trade secret afforded the particular Defendant a competitive advantage." Jury Inst. 26. One may well be able to improve on these instructions as an enunciation of the head start principle. However, as the district judge made

clear in its discussions with counsel, *see* Aplt. App. at 2112, Ballard was free to argue, consistent with these instructions, that its misappropriation of Mr. Russo's trade secrets only benefitted it by the time period in which the misappropriation afforded the company a head start to market. Not only does Ballard concede that it made just such an argument to the jury, *see* Aplt. Reply Br. at 43, but the jury's ultimate award of unjust enrichment, which, again, amounted to only 53% of what Mr. Russo's expert calculated Ballard's net profits from the lifetime of the patents to be, is consistent with the adoption of Ballard's argument. In these circumstances taken as a whole, we cannot say that the district court's failure to give Ballard's proffered instruction amounted to an abuse of discretion, or that its instructions failed to inform the jury fairly of the governing law. *See Brown v. Wal-Mart Stores, Inc.*, 11 F.3d 1559, 1564 (10th Cir. 1993) (we "consider all that the jury heard and, from [the] standpoint of the jury, decide not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had [an] understanding of the issues and its duty to determine those issues") (quotations omitted); *United States v. Holly*, 488 F.3d 1298, 1302 (10th Cir. 2007) (We "review a district court's decision to give [or decline to give] a particular jury instruction for an abuse of discretion and consider the instructions [as given] as a whole de novo to determine whether they accurately informed the jury of the governing law.").

Third, and finally, Ballard argues that unjust enrichment damages are inappropriate as a matter of law for the misappropriation of a trade secret where, as here, the plaintiff was willing to license his or her idea. Appellant's Br. at 58. Elsewhere in its brief, Ballard returns to this theme, suggesting that, because Mr. Russo had no independent means of bringing his idea to market, "the only way Russo could have profited" from his idea without licensing it to Ballard would have been to license it to another party such that his innovations would no longer be secret. Appellant's Br. at 68.[9] Given these circumstances, Ballard submits, the district court should have allowed Mr. Russo to recoup only royalty, not unjust enrichment, damages.

We cannot agree. In Ballard's view, unjust enrichment damages are appropriate only when the defendant has used a misappropriated trade secret to compete with the plaintiff, because there the defendant's profits serve as a proxy for the plaintiff's lost profit. *See* Appellant's Br. at 59 (citing *Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005)); *see also* Restatement (Third) of Unfair Competition § 45, cmt. d (noting that one measure of monetary relief for misappropriation is the award of plaintiff's profit

---

[9] While afforded its own heading, Ballard devotes only 10 lines to this argument in its brief. We believe it is a related and further refinement of the first line of argument concerning Mr. Russo's willingness to license the technology to Ballard, but any misapprehension on this score must be attributable to the argument's lack of development. *See W.D. Sports*, 497 F.3d at 1095; *United Transp. Union v. Dole,* 797 F.2d 823, 827 (10th Cir. 1986).

loss). While perhaps a plausible position as a policy matter, the problem with Ballard's argument is that the Utah legislature has rejected it. Under Utah Code Ann. § 13-24-4(1), a plaintiff has the express choice of seeking unjust enrichment damages to remedy trade secret misappropriation. *See supra* n.8 (quoting statutory language). Apparently, it was the Utah legislature's desire to ensure that misappropriators are not allowed to keep ill-gotten gains from their unlawful acts of misappropriation.

Neither is Utah alone in its judgment. The Restatement recognizes that unjust enrichment awards can in these circumstances serve a legitimate deterrent function, *see* Restatement (Third) of Unfair Competition § 45, cmt. g ("Since the imposition of a reasonable royalty requires the defendant to pay only the amount it would have paid had it fairly bargained for use of the plaintiff's secret, it may not adequately discourage the appropriation of trade secrets."), and the Supreme Court has acknowledged that one of the functions of trade secret law is to ensure that "industrial espionage is [not] condoned or . . . made profitable," *Bonito Boats*, 489 U.S. at 155. Unlike a standard breach of contract claim, after all, a misappropriation claim involves an allegation of theft, and it is not unknown to require a thief to return not only what was stolen, but any additional consequential profits he or she reaped as a result of his or her wrongful actions. While it is true that the unjust enrichment award put Mr. Russo in a much better

position than if he had entered a licensing agreement with Ballard, under Utah law, Ballard, as the party that acted wrongfully, must assume the risk it took by misappropriating rather than licensing Mr. Russo's secret. Neither are we free to substitute our judgment for that of the Utah legislature on this score. *See also American Cyanamid*, 342 F.3d at 1311 (rejecting materially identical argument under Colorado law).[10]

## VI

_____

[10] Relatedly, Ballard fleetingly suggests that the Utah Trade Secrets Act prohibits the award of both unjust enrichment damages and royalty. But the royalty awarded by the jury was not associated with Mr. Russo's claim under the trade secrets statute. Instead, it was associated with a separate contract claim for breach of the CDA and represented his estimated actual loss based on the parties' actual history of negotiations. Ballard offers no reason or authority suggesting that the Act serves to limit damages obtained in a separate contract action. In fact, even under the Act itself damages "can include both the actual loss caused by misappropriation [including as measured by royalty] and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." U.C.A. 1953 § 13-24-4. *See also Water & Energy Sys. Tech., Inc. v. Keil*, 48 P.3d 888, 894 (Utah 2002) (under Utah law, plaintiff can recover both actual damages and unjust enrichment as long as the awards are not duplicative). Of course, this is not to say that a party may receive the same damages twice simply by seeking two forms of relief or invoking two different causes of action. *See Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1080 (10th Cir. 2008) (when it is clear that duplication occurred the "court must . . . reduce the verdict by the amount duplicated"). But Ballard has presented to us no complaint about duplicative awards, and it would be difficult to see how it could. Even if Mr. Russo's request for $32 million in unjust enrichment damages overlapped with the approximately $3 million he sought in royalty payments, a fact neither argued to us nor clear from the record, the jury awarded only 53% of the requested $32 million in unjust enrichment damages, leaving ample room for a non-duplicative $3 million royalty award.

Having exhausted Ballard's appeal, we must still confront Mr. Russo's cross-appeal. Mr. Russo contends that the district court erred in denying his motion for interest on his damages award for the period between the issuance of the jury verdict and the entry of the judgment, a period of approximately four months in this case.

Whether post-verdict, pre-judgment interest is recoverable in diversity cases is a question of state law. *See Chesapeake Operating, Inc. v. Valence Operating, Inc.*, 193 F.3d 1153, 1156 (10th Cir. 1999). Mr. Russo argues that the plain language of Rule 54(e) of the Utah Rules of Civil Procedure requires the issuance of post-verdict interest in every civil case. That Rule provides in relevant part that

> [t]he clerk must include in any judgment signed by him any interest on the verdict or decision from the time it was rendered, and the costs, if the same have been taxed or ascertained. The clerk must, within two days after the costs have been taxed or ascertained, in any case where not included in the judgment, insert the amount thereof in a blank left in the judgment for that purpose.

As Mr. Russo reads the Rule, the term "the same" refers only to "costs"; thus, in his view, the Rule requires the clerk to add interest on the verdict as a matter of course, and to add costs only if they have already been "taxed or ascertained."

We do not question that Mr. Russo's interpretation of the Rule is at least a plausible one, particularly given that the comma following "rendered" sets apart the references to interest and costs such that the subordinate clause, "if the same

- 38 -

have been taxed or ascertained" appears to modify only "costs." Without that comma, the "same" would have more clearly referenced both interest and costs. Notably, too, the term "taxed or ascertained" appears again in the second sentence, and there applies only to costs, making no reference to interest. We also acknowledge that states with similar rules sometimes do authorize post-verdict, pre-judgment interest, just as Mr. Russo seeks here.[11]

The difficulty with Mr. Russo's reading of the Rule, as Ballard points out, is that, if it were correct, post-verdict, pre-judgment interest would be an everyday matter in Utah. Yet, Mr. Russo cites to us not a single Utah case adopting his view of Rule 54(e). And while the Rule is no model of clarity, Ballard notes that it does not unavoidably suggest that "the same" refers to both "interest" and "costs." It is at least possible, Ballard stresses, that only interest and costs "taxed or ascertained" by the trial court should be added to a verdict amount before its final entry as a judgment; and because the trial court did not tax or ascertain any interest here, none was properly included in the judgment.

---

[11] *See, e.g., Simmons v. New York City Transit Auth.,* No. CV-02-1575, 2008 WL 3251391, at *1 (E.D.N.Y. July 31, 2008) (under New York law, post-verdict, pre-judgment interest should always be entered to "indemnify successful plaintiffs for the nonpayment of what is due to them . . ."); *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 592 N.W.2d 279, 282 (Wis. Ct. App. 1998) (Wisconsin law provides that "interest at the rate of 12% per year from the time of verdict, decision or report until judgment is entered shall be computed by the clerk and added to the costs"); *see also* 1 ALR2d 479, Date of Verdict or Date of Entry of Judgment Thereon as Beginning of Interest Period on Judgment (discussing diverging state views on this subject).

Perhaps more persuasively still, Ballard draws our attention to *Bailey-Allen Co. v. Kurzet*. There, the Utah Court of Appeals expressly held that, at least where a claim is considered unliquidated before trial, as in the case of a claim arising in equity or (as here, with respect to Mr. Russo's primary cause of action) for unjust enrichment, interest should run "from the date the . . . judgment is entered, rather than orally rendered" because an oral ruling liquidating damages is "subject to change before entry." 876 P.2d 421, 427 n.4 (Utah Ct. App. 1994). The *Bailey* court proceeded to cite with favor a Wyoming case declining to authorize post-verdict, pre-judgment interest on the basis that a "verdict is not final liquidation of sum due until judgment." *Id*. (citing *Pure Gas & Chem. Co. v. Cook*, 526 P.2d 986, 993 (Wyo. 1974)). *Bailey* also cited in support of its conclusion Utah Rule of Appellate Procedure 32, which provides that, "[u]nless otherwise provided by law, if a judgment for money in a civil case is affirmed, whatever interest is allowed by law shall be payable from the date the judgment was entered." *Id*.

In light of this authority, we are unable to conclude that Utah law definitively authorizes post-verdict, pre-judgment interest in all cases, as Mr. Russo's line of argument suggests. The decision whether to do so is a matter for the legislature and courts of Utah, not us, and, accordingly, we believe it proper to leave any further development of the law on this point to those authorities. *Cf.*

*Kaiser Aluminum v. Bonjorno*, 494 U.S. 827, 835 (1990) (in "the absence of legislative intent to the contrary, we conclude that postjudgment interest properly runs from the date of the entry of judgment[,]" not from the date of the entry of a verdict).

* * *

The judgment of the district court is affirmed.